UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SHERIF SAAD; NOOSHIN SOOZANGAR,
            *Plaintiffs-Appellants,*

                and

DAVID C. GRIGGS; ADEL ALALFEY;
OSSAMA NAGY; SHAGUFLA AZAD,
                        *Plaintiffs,*

                    v.

THE BALTIMORE LIFE INSURANCE
COMPANY; LIFE OF MARYLAND,
INCORPORATED,
            *Defendants-Appellees,*

                and

L. JOHN PEARSON; WILLIAM
VIGLIOTTE, Vice President of
Underwriting; GRAY RAY, Vice
President for Career Marketing;
MORRIE R. CLARK, Senior
Underwriter; DAVID S. SACHS;
DAMIAN A. SALVI,
                    *Defendants.*

THE MARYLAND INSURANCE
COMMISSION,
                    *Movant.*

No. 01-2081

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-96-3673-AMD)

Argued: April 2, 2002

Decided: September 26, 2002

Before MOTZ, Circuit Judge, Walter K. STAPLETON,
Senior Circuit Judge of the United States Court of Appeals
for the Third Circuit, sitting by designation, and
W. Craig BROADWATER, United States District Judge
for the Northern District of West Virginia,
sitting by designation.

---

Reversed in part, affirmed in part, and remanded by unpublished
opinion. Judge Broadwater wrote the opinion, in which Judge Motz
and Senior Judge Stapleton joined.

---

**COUNSEL**

**ARGUED:** Carmen L. Rivera Matos, Doylestown, Pennsylvania, for
Appellants. Stanley Mazaroff, VENABLE, BAETJER & HOWARD,
L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** George W.
Hermina, John W. Hermina, HERMINA LAW GROUP, Laurel,
Maryland, for Appellants. Christine P. D'Elicio, VENABLE, BAET-
JER & HOWARD, L.L.P., Baltimore, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

BROADWATER, District Judge:

Plaintiffs Sherif Saad and Nooshin Soozangar appeal the district
court's grant of defendant Baltimore Life Insurance Company's
motion for judgment as a matter of law. We reverse.

I.

Although legal residents, the plaintiffs Sherif Saad and Nooshin
Soozangar are not United States citizens. Plaintiff Saad is a citizen of

Egypt. During the time in question, he served as the medical director for the Kuwaiti Embassy to the United States. Saad is also a legal resident of the United States.

Plaintiff Soozangar is an Iranian citizen. She came to the United States in 1991. Soozangar is a legal resident pursuant to her marriage to a United States citizen.

In December 1994, Saad and Soozangar applied for universal life insurance policies from Baltimore Life. Following the submission of their applications, Baltimore Life representatives contacted the plaintiffs by telephone. The representatives asked both plaintiffs if they were citizens of the United States. Shortly after these telephone calls, the plaintiffs both received letters from Baltimore Life stating that their applications were rejected. The stated basis for both rejections was "(s)ince it is company policy not to issue coverage on people who are not United States citizens." J.A. at 387, 388, 1304 and 1755.

Following these rejections, the plaintiffs and others in 1996 filed suit against Baltimore Life alleging violations of 42 U.S.C. § 1981. After discovery, the district court granted summary judgment for Baltimore Life. *Nagy v. Baltimore Life Ins. Co.*, 49 F.Supp.2d 822 (D. Md. 1999). In an unpublished *per curiam* opinion, this Court reversed the district court's decision with respect to the alienage discrimination claims. *Nagy v. Baltimore Life Ins. Co.*, 215 F.3d 1320, 2002 WL 718391, *6 (4th Cir. 2000 (Md.)). The *Nagy* court noted that Baltimore Life's contention that it "only denied life insurance policies based on applicants' place of citizenship, not applicants' non-citizenship" were "arguments properly resolved by a trier of fact, not a district court or appellate court on summary judgment." *Id*. at *6 n.2. In affirming summary judgment on the racial discrimination claim, this Court remanded the case with instructions to proceed to trial on the alienage claims.

Upon remand, the case went to trial. The plaintiffs presented the deposition testimony of Morrie Clark, a senior underwriter for Baltimore Life. The plaintiffs also examined William Vigliotte, the Vice President of Underwriting. Most of their testimony was presented earlier in support of the prior summary judgment motions.

Clark stated that the signature on the letters was not his but that a number of clerks in his office were authorized to sign his name. Assuming he made the denial of coverage, Clark could not recall the specific details. Clark did admit that he was aware that the rejection letter contained language denying coverage to non-United States citizens. However, Clark could not recall a particular policy that covered sending rejection letters or any specific instance under him that an applicant was denied coverage because they were not United States citizens.

William Vigliotte, as Baltimore Life's Vice President of Underwriting, set the policy on accepting risks. Vigliotte admitted that Baltimore Life did have a policy denying coverage to non-United States citizens, but he stated it was loosely enforced. He said that Baltimore Life hired Adel Alalfey to sell insurance to people of Middle Eastern decent. However, Alalfey's contacts with individuals employed by the Kuwaiti Embassy caused Vigliotte concern due to the unstable nature of the region after the Gulf War.

In the trial, new evidence came out during Vigliotte's testimony. He stated that the two internal Baltimore Life e-mails sent out under the name "Morrie Clark" were, in fact, sent by Clark. J.A. at 1595-96. These e-mails report the rejection of Saad and Soozangar's applications, stating as a reason the Baltimore Life policy on denying coverage to non-citizens. Vigliotte also agreed that the rejection "letters are signed by Morrie Clark." J.A. at 1595.

The district court next refused the plaintiffs' request to introduce the deposition of Mark W. Hastings, a former General Counsel of Baltimore Life. J.A. 1230-36 and 1427-28. The plaintiffs proferred Hastings' testimony as evidence for punitive damages because Hastings reportedly informed Baltimore Life that its non-citizen policy violated federal law. J.A. 1232. The district court refused to allow Hastings' testimony as plaintiffs' counsel did not know what date Hastings gave his advice.

At the conclusion of the plaintiffs' case, the district court granted judgment as a matter of law in dismissing the liability claims against Baltimore Life and granting Baltimore Life's motion for dismissal of the "economical and emotional damages." J.A. 1859. The district

court wrote in its order that "judgment is entered in favor of defendant against plaintiffs; and in the alternative, if judgment in favor of defendant is found upon appeal to be erroneous, then this judgment shall be deemed to be entered in favor of plaintiffs . . . for the sum of One ($1.00) Dollar each, for a total of Two ($2.00) Dollars nominal damages only." J.A. 1857. The order also incorporated by reference its earlier ruling that the plaintiffs had not presented sufficient evidence to support an award of punitive damages. J.A. 1230-31.

Saad and Soozangar appeal these rulings and also whether the district court improperly denied their motion *in limine* as to a market conduct exam. Finally, the appellants request assignment to a different district judge if the case is remanded.

## II.

When an appellate court decides a rule of law, that decision must continue to govern the same issues in subsequent stages in the same case unless "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work a manifest injustice." *Columbus-America Discovery Group v. Atlantic Mutual Insurance Co.*, 203 F.3d 291 at 304 (4th Cir. 2000) (internal citations omitted). In this case, the Nagy Court reviewed the record presented at summary judgment and determined that "these two plaintiffs met their burden of producing direct evidence of discrimination on the basis of alienage." *Nagy* at *6. There appears to be no new "substantial" evidence introduced at trial, or any new precedent, to compel a departure from this ruling.

However, the district court concluded that there was new testimony from Clark at trial, which was "unimpeached," and which established as a matter of law that Clark did not write this letter. Baltimore Life made this same argument in support of its motion for summary judgment. J.A. 90 n.4. As well, the litigants introduced substantially similar evidence on this point at summary judgment and at trial. The following testimony from Clark was proffered in support of summary judgment: (1) the signature on the letters was not his; (2) he did not recall sending the letters out or asking anyone to write them for him; and (3) although he "assumed" that the decision to deny coverage to

both Saad and Soozangar was his, he could not recall why coverage was denied in either case. J.A. 296, 1467, 590-92.

At trial, both sides confined themselves almost entirely to deposition transcript excerpts submitted at the summary judgment stage. Baltimore Life introduced only one new section of Clark's transcript in which he stated that no one at Baltimore Life "made him aware" that Soozangar's application was being rejected, and that "the first time [he] recall[ed] seeing the name" was on the day before his deposition. J.A. 1509. This testimony appears not to be a new detail or a new point. The summary judgment record contained Clark's testimony that no one "working for Baltimore Life Insurance Company ever made [him] aware that an individual or individuals were being declined coverage because they are not United States Citizens." J.A. 90 n.4.

With respect to Vigliotte, none of his testimony represented a material departure from the summary judgment record. Counsel for Baltimore Life argues that Vigliotte introduced new evidence when he testified "that . . . Baltimore Life never had any policy to refuse persons who were not United States Citizens of life insurance solely because of their citizenship," and instead made "rational inquiries about citizenship for the purpose of determining whether it was likely that they would travel abroad." That explanation was in the summary judgment record and was described in detail in the district court's memorandum opinion in support of summary judgment. J.A. 1667-68. Baltimore Life also notes that Vigliotte testified at trial that he never approved or saw the letter. However, similar statements were introduced in his deposition and are present in the summary judgment record. J.A. 497-99.

Saad and Soozangar do not allege that Vigliotte himself authored or read the letters. They argue that (1) Vigliotte made statements indicating an anti-foreigner bias (e.g., re: hostages); (2) Vigliotte believed that the practice of not writing coverage on non-U.S. citizens was "widespread"; and (3) Vigliotte admitted in an affidavit that Baltimore Life adopted such a policy. J.A. 48, 164. At trial, Vigliotte conceded the first two points. J.A. 1518 (Kuwait); 1523 (widespread). With respect to the third, Vigliotte repeated testimony available in the summary judgment record that Baltimore Life did not, in fact, have

a policy of rejecting non-U.S. citizens. He asserts he was guilty of nothing more than a poor choice of words in the first affidavit, which was produced for different purposes. Saad and Soozangar impeached his testimony with the first affidavit. J.A. 1540-44.

Section 1981 bars discrimination on the basis of race and ethnicity, or lack of citizenship. *Duane v. GEICO*, 784 F. Supp. 1209, 1216 (D. Md. 1992), *aff'd*, 37 F.3d 1036 (4th Cir. 1994). It "does not provide protection," however, "for individuals discriminated against on the basis of national origin." *Id*. (citing *Al-Khazraji*, 481 U.S. at 613).

To prevail under § 1981, a plaintiff must prove that such discrimination was intentional, and led to the deprivation of one of the rights enumerated therein. *See Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999). How the proof proceeds depends on the evidence proffered by the plaintiff. Where the plaintiff cannot produce direct evidence of discriminatory intent, the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (Claims under 1981 are analyzed in the same manner as claims under Title VII or the ADEA). After a plaintiff satisfies the "modest" requirements of the prima facie case, the defendant must produce a nondiscriminatory reason for the challenged action, after which the burden returns to the plaintiff to prove that the defendant's "proffered non-racial reason . . . was, in reality, a pretext for a racially motivated decision." *Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir. 1995). In contrast, if a plaintiff can present sufficiently direct evidence of discrimination, he or she qualifies for the "more advantageous standards of liability applicable in mixed-motive cases." *Id*. at 1141.

In this case, Baltimore Life contends that Vigliotte is the relevant decision-maker and that Saad and Soozangar must prove that he intentionally discriminated against them. Baltimore Life relies on *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995) (stating that the burden of persuasion shifts if plaintiff presents "direct evidence that decision-makers placed substantial negative reliance on an illegitimate criterion"). This argument appears to be based on the letters, which state that Baltimore Life has a "policy" of denying coverage to non-citizens, and on the apparently uncontested fact that only Vigliotte, not Clark, was entitled to establish any such policy.

The plaintiffs argue the relevant decision-maker in this case is Clark, a Senior Underwriter who was undisputedly authorized to act for the company in accepting or denying applications. Since the letters were sent out over his signature, Clark arguably denied the application because he believed that such a policy existed.

Thus, although this Court is reversing the district court's grant of judgment as a matter of law on liability, this is not to say that judgment should be entered in favor of the plaintiffs. Simply, the plaintiffs have submitted enough evidence to require the defendant to meet its burden or send the case to the jury for a finding of fact.

### III.

Neither Saad nor Soozangar is entitled to the face value of the policies as both are still alive. Nor did they introduce evidence of any other economic damages at trial. Upon her denial, Soozangar immediately obtained insurance from Peoples Life, and she sought and obtained insurance from Baltimore Life in 1996. She did not proffer any evidence of economic damages from the denial.

Saad contends that he had economic damages because he lost an investment opportunity. He concedes, however, that he elected to put his money in a savings account instead of "investing" in another life insurance policy. Consequently, he has failed in his duty to mitigate. *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 966-67 (4th Cir. 1985).

It is clear that the evidence presented on emotional damages is insufficient to sustain a large award. Our decision to vacate the district court's alternative order is not meant in any way to suggest that the evidence presented in this trial was adequate to support a substantial award of compensatory damages for emotional injury. Although "a plaintiff's testimony, standing alone, may support" an award of compensatory damages, claims of injury based solely on testimony must be "scrupulous[ly] analyzed." *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996). As the *Price* court explained,

> the testimony must establish that the plaintiff suffered *demonstrable* emotional distress, which must be *sufficiently*

*articulated*; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages.

*Id*. at 1254 (emphasis added). Thus, claims of "depression" do not by themselves support an award. In assessing such testimony, a court must consider the context of the claims, including the nature of the conduct allegedly causing the injury and any other losses to the plaintiff, such as the esteem of his or her peers, income, physical function. *Id*. at 1254-55.

In this case, Saad and Soozangar's testimony, if believed, describes an injury of uncertain intensity. Soozangar asserts that she was "unhappy" and "so upset," and states that she just "couldn't be productive" at work and "would sit and watch the TV." J.A. 1355. Saad and his wife state that he lost some sleep, that his appetite was affected and that he was not as "interested as usual" in playing with his children or going out. J.A. 1607-08. Neither Saad nor Soozangar went to a doctor or counselor, or describe any physical ailments.

More significant is factual background on which this testimony was given. Soozangar obtained new life insurance within two weeks and she testified that when she received the insurance "then I feel better . . . I know it was nothing wrong with me." J.A. 1355. There is no reason to believe that Saad was unable to obtain substitute coverage, and in fact, his wife did obtain an annuity. Moreover, Baltimore Life took corrective action before this litigation commenced, contacting both plaintiffs and inviting them to reapply. Finally, any discrimination by Baltimore Life did not deprive Saad or Soozangar of an ongoing relationship or settled expectations. In contrast to an eviction or employment practice, Saad and Soozangar were not faced with the loss of their residence, longstanding relationships or job skills. As this Court noted in *Hetzel v. County of Prince William*, 89 F.3d 169 (4th Cir. 1996), awards of more than $25,000.00 in compensatory damages for intangible injuries commonly involve "plaintiffs that either were the victims of invidious discrimination, suffered serious — often permanent — physical injuries, or were discharged and had difficulty finding alternative employment." *Id*. at 172. While we will not speculate on the evidence that will be presented upon retrial, we note that

it would have to be substantially different than that presented already to support any substantial award for emotional damages.

IV.

Early in the trial, the district court informed the parties that it would not submit the question of punitive damages to the jury. The court explained its reasoning most fully when it stated that: "from December of 1994 through the Spring of 1995 an insurance company in America could not reasonably have believed, notwithstanding *Duane v. GEICO*, (*referring to* 37 F.3d 1036 (4th Cir. 1994)), that a resident alien in America had a federally-protected right to an insurance policy." J.A. 1231. *Duane v. GEICO*, a Fourth Circuit case, was published in October 1994 and held that a non-citizen had stated a claim against GEICO when he alleged that the company had refused to sell him an insurance policy because of his non-citizen status.

Two cases, *Kolstad v. American Dental Assm.*, 527 U.S. 526 (1999), and *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431 (4th Cir. 2000), provide clear guidance as to the proper standards in a § 1981 punitive damages case. In *Kolstad*, the Supreme Court "flatly rejected the notion" that punitive damages are available only in cases of "egregious misconduct." *Lowery*, 206 F.3d at 441 (*citing Kolstad*, 119 S. Ct. at 2124). Rather, the statute requires "malice" or "reckless indifference" to a federally protected right. Thus, in cases where a federal right is at stake, the crucial questions "pertain to the [defendant's] knowledge that it might be acting in violation of federal law." *Kolstad*, 119 S. Ct. at 2124. To answer these questions, a defendant's actual knowledge is relevant. *Id*.; *see also Lowery* at 443 (determining, "individually," the level of relevant legal knowledge for each of the two defendants).

This rule suggests two considerations relevant to this case. First, while the novelty or public knowledge of a legal theory is surely relevant to the punitive damages inquiry, such generalized factors cannot defeat proof that the relevant decision-makers had relevant knowledge. At present, there is no direct evidence that Baltimore Life knew of the relevant federal right.

Second, in assessing the novelty of *Duane v. GEICO* it is noted that the decision-makers in this case were underwriters for an insurance

company. To prevail against the punitive damages claim, Baltimore Life must contend that its underwriters were unaware of controlling Fourth Circuit precedent touching directly on legal rules governing issuance of insurance policies. It would appear to be problematic to hold that an insurance company's ignorance of such precedents is not, at least, reckless. This is more applicable in light of Vigliotte's testimony that insurers routinely consider citizenship in deciding whether to issue policies. Even if plaintiffs prevail on liability, punitive damages will be available only if Baltimore Life is shown to have had actual knowledge that its denials of plaintiffs' applications violated § 1981 or to have acted with reckless indifference to whether those denials constituted such violations.

V.

The plaintiffs also challenge two of the district court's evidentiary rulings. First, the district court refused to admit the deposition testimony of Baltimore Life's former associate general counsel, Mark W. Hastings. Second, the district court admitted the Maryland Insurance Administration market conduct exam. Only upon a finding that the trial judge abused its discretion should an appellate court reverse a trial judge's evidentiary rulings. *Martin v. Deiriggi*, 985 F.2d 129, 137 (4th Cir. 1993). We find that the district court did not abuse its discretion as to both evidentiary rulings.

Saad and Soozangar proffered Hastings' testimony as evidence on the punitive damages issue. J.A. 1230. Because the district court believed that there was "no basis . . . whatsoever to award punitive damages in this case," it ruled that his testimony was inadmissable. *See id.*

Counsel for Saad and Soozangar argued that Hastings' testimony could rebut the court's presumption about what Baltimore Life could have believed, because Hastings allegedly informed Baltimore Life that its policy violated federal law. This proffer apparently gave the district court cause to reconsider because the district court then asked counsel when Hastings gave this alleged advice. J.A. 1233. Saad and Soozangar conceded that they had not obtained an exact date, and the court restated its refusal to allow Hastings' testimony. *Id.*

The lack of a date is sufficient to uphold the district court's decision under the abuse of discretion standard. If Hastings gave his advise after the relevant decisions were made, his testimony could surely be more prejudicial than probative. Moreover, Hastings' testimony does not concede the existence of any policy or even any causal relationship. Hastings was not asked the reason for denials of insurance coverage to non-U.S. citizens, in this question, nor did he give a reason in answer to any of the questions.

The district court did not err in denying Saad's motions in limine regarding the market conduct exam. Saad and Soozangar objected to the introduction of a Market Conduct Exam conducted on Baltimore Life by the Maryland Insurance Commissioner and also to Baltimore Life's references to the Swiss Re Life and Health Life Guide. J.A. 886-88, 1838-50, 860-72, 172-77. Admitting this evidence was not an abuse of discretion.

## VI.

We have carefully considered the plaintiffs' request for assignment to a different district court upon remand. After thorough review of the record, we conclude that such relief is not warranted. We are confident that on remand the experienced district judge will faithfully follow our mandate.

## VII.

We reverse the district court's judgment as a matter of law as to liability, compensatory damages, and punitive damages. We affirm the district court's evidentiary ruling and deny assignment to a new judge.

*REVERSED IN PART, AFFIRMED
IN PART, AND REMANDED*